**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DEREK REDMOND, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | 11 C 8542 |
| v. | ) | |
| | ) | |
| MARY REDMOND, | ) | |
| | ) | Hon. Charles R. Norgle |
| Respondent. | ) | |

**OPINION AND ORDER**

Before the Court is Petitioner Derek Redmond's ("Mr. Redmond") petition for the return of his son ("JMR") to Ireland pursuant to the International Child Abduction Remedies Act (the "ICARA"), 42 U.S.C. § 11601 *et seq*., which implements the Hague Convention on the Civil Aspects of International Child Abduction (the "Convention"), T.I.A.S. No. 11,670, 1343 U.N.T.S. 89 (Oct. 25, 1980). For the following reasons, the petition is granted. JMR shall be promptly returned to Ireland, accompanied by Ms. Redmond, on or before July 9, 2012.

**I. BACKGROUND**

The ICARA "entitles a person whose child has been removed from his custody (sole or joint) to the United States (usually by the other parent) to petition in federal or state court for the return of the child." Khan v. Fatima, No. 12-1692, 2012 WL 1560398, at *1 (7th Cir. May 4, 2012). "The Convention was adopted in 1980 in response to the problem of international child abductions during domestic disputes." Abbott v. Abbott, 130 S. Ct. 1983, 1989 (2010). "The Convention seeks to discourage abductions by parents who either having lost, or expecting to lose, a custody battle remove children to a

country whose courts are more likely to side with that parent." <u>Altamiranda Vale v. Avila</u>, 538 F.3d 581, 583 (7th Cir. 2008) (citations omitted). To prevent such an "unsavory form of forum shopping," <u>Kijowska v. Haines</u>, 463 F.3d 583, 586 (7th Cir. 2006), a child that has been wrongfully removed or retained in violation of a right of custody must be promptly returned to the child's country of habitual residence, unless certain narrow exceptions apply, <u>Abbott</u>, 130 S. Ct. at 1987. "A return remedy does not alter the pre-abduction allocation of custody rights but leaves custodial decisions to the courts of the country of habitual residence." <u>Id.</u> at 1989 (citation omitted). Indeed, the ICARA and the Convention "empower courts in the Untied States to determine only rights under the convention and not the merits of any underlying child custody claims." 42 U.S.C. § 11601(b)(4); <u>see</u> <u>also</u> Convention art. 19.

On December 1, 2011, Mr. Redmond filed the instant petition for an order returning JMR to Ireland. On February 8, 2012, Mr. Redmond filed a motion for an immediate hearing on the petition. The motion, however, was improperly noticed before Magistrate Judge Gilbert and was therefore stricken. Minute Order, Feb. 10, 2012. Rather than file a response to the petition, Respondent Mary Redmond ("Ms. Redmond") filed a motion for summary judgment on February 14, seeking denial of the petition in its entirety. On May 11, the Court denied the motion, ordered Ms. Redmond to file a response to the petition by May 25, and set the case for status on June 8, at 10:00 a.m. Minute Order, May 11, 2012. Ms. Redmond timely filed her response, which included two affirmative defenses. On June 8, both Mr. and Ms. Redmond personally appeared and the Court held an evidentiary hearing lasting approximately one-and-a-half hours. At the close of the hearing, the Court ordered the parties to submit findings of fact and conclusions of law,

and set the matter for status on June 14, at 10:00 a.m., at which time JMR was ordered to appear. Mr. Redmond, Ms. Redmond, and JMR personally appeared at the June 14 hearing, wherein the Court, in an abundance of caution, indicated that the matter was taken under advisement and that an Opinion and Order would issue expeditiously. The Convention mandates the Court to promptly determine whether to order the return of JMR to Ireland. Convention arts. 7, 11. This decision on the merits incorporates the Court's findings of fact and conclusions of law, as required by Federal Rule of Civil Procedure 52.

## A. Findings of Fact

### 1. Introduction

Ms. Redmond was born in the United States on December 24, 1977. Although a United States citizen, Ms. Redmond testified that she also holds citizenship in Ireland, where her father was born. Mr. Redmond was born in Ireland on June 14, 1975. In 1996, at the age of nineteen, Ms. Redmond went to Ireland and attended college. Around this time, she began an intimate relationship with Mr. Redmond. Mr. Redmond and Ms. Redmond never married.

Ms. Redmond received her Irish Associates Degree in 1998, and continued to live in Ireland until November 2007. In 2006, the parties, who were living together, conceived a child. They agreed that the child should be born in the United States. On March 28, 2007, JMR was born in Blue Island, Illinois. Mr. Redmond was present for JMR's birth and is listed as the father on JMR's United States birth certificate. On April 8, 2007— eleven days after JMR was born—the parties returned with JMR to their common residence in Ireland.

From his birth until November 2007, JMR lived with both of his parents in Ireland. During this time, Mr. and Ms. Redmond shared the intent that JMR be raised in Ireland. By November 10, 2007, however, the relationship soured and Ms. Redmond "changed her intent as to where she wanted to live and [where JMR] should be raised." Petitioner's Proposed Findings of Fact & Conclusions of Law ¶ 11; see also Resp. to Verified Petition for Return of Child ¶ 17(c) ("Respondent informed Petitioner personally of her intent to return permanently to the United States on November 10, 2007."). Mr. Redmond has never changed his intent that JMR be raised in Ireland. On November 10, 2007, Ms. Redmond took JMR to Illinois.

Ms. Redmond returned to Ireland with JMR in February 2008 for a period of about two months. The record is sparse as to the purpose of this return. According to a draft affidavit, unsigned yet filed by Ms. Redmond's solicitor in the Irish proceedings, Ms. Redmond returned in order to finish collecting her personal belongings. See Draft Aff. Required to Ground Application for Judicial Review ¶ 7 (July 30, 2008).[1] On March 12, 2008, Ms. Redmond visited Bridget Dwyer, a community welfare officer in Carlow, Ireland. The parties dispute the substance of this meeting. Ms. Redmond's solicitor states that Ms. Redmond requested information regarding maintenance payments for JMR. See id. ¶ 15. Mr. Redmond's solicitor, however, states that Ms. Redmond met with Ms. Dwyer in order to apply for "periodic payments" without stating or giving any indication that she was living in the United States. Aff. of Opposition to Application for Judicial Review ¶ 8 (Aug. 22, 2008). According to the affidavit, "Ms. Dwyer stated that she would have expected [Ms. Redmond] to disclose such a fact and that to qualify for

---

[1] A certified copy of the complete record from the Irish proceedings was admitted into evidence during the June 8, 2012 evidentiary hearing.

these periodic payments one would have to be resident in Ireland at the date of application and for the duration of the receipt of such payments." Id. Periodic payments are made by HSE Community Welfare in Ireland.

### 2. Custody Proceedings

On March 25, 2008, Mr. Redmond filed a petition in the Irish district court seeking legal guardianship and custody of JMR and the matter was set for hearing on April 17, 2008. At the time he filed the petition, Ms. Redmond and JMR were in Ireland. After learning that they were planning to leave Ireland, Mr. Redmond obtained an ex parte Order preventing them from doing so. Pursuant to that Order, the Irish National Police stopped Ms. Redmond and JMR from departing Ireland on April 8, 2008.

Mr. and Ms. Redmond were represented by counsel throughout the Irish proceedings. On April 17, 2008, Ms. Redmond attended the hearing and moved to set aside the April 8 Order. Her motion was denied and she appealed. On April 22, 2008, the appellate court ruled in her favor, setting aside the April 8 Order. The Order noted that Ms. Redmond had agreed to return to Ireland for a future hearing. On April 23, 2008, Ms. Redmond left with JMR for Illinois.

On June 25, 2008, the Irish district court ruled that it did not have jurisdiction over Mr. Redmond's application for guardianship and custody because JMR had been removed to the United States. Mr. Redmond appealed and a hearing was set for July 29, 2008. On July 23, 2008, Mr. Redmond obtained an ex parte Order requiring Ms. Redmond to appear with JMR at the July 29 hearing. At the hearing, neither Ms. Redmond nor JMR appeared. The Irish appellate court denied Ms. Redmond's motion

(through counsel) for a continuance and found that it had jurisdiction to consider Mr. Redmond's application for guardianship and custody.

Ms. Redmond subsequently appealed to the Irish High Court. The High Court heard the matter on November 18, 2008, and issued judgment on November 26, 2008, ruling against Ms. Redmond. Ms. Redmond conceded in January 2009 that the Irish courts had jurisdiction to hear Mr. Redmond's custody application.

Also in January 2009, Ms. Redmond filed her own application in the Irish courts for an Order allowing JMR to permanently relocate with her to the United States. On July 2, 2009, the Irish court conducted a hearing on both Mr. Redmond's application for custody and guardianship and Ms. Redmond's application to permanently relocate JMR. After hearing testimony from both sides, the court ordered a family therapist to conduct an independent psychiatric assessment (known in Ireland as a "Section 47 Report"). In preparing the Section 47 Report, the family therapist interviewed Mr. Redmond alone and with JMR, Ms. Redmond alone and with JMR, and numerous family members. The therapist also reviewed documents, such as JMR's medical and school reports. The Section 47 Report, which is thirty-five pages, ultimately recommended that Mr. Redmond be granted guardianship of JMR and that JMR reside in Ireland so that he could have a relationship with both of his parents.

On February 10, 2011, the Irish court—upon consideration of, *inter alia*, the pleadings, testimony of the parties and family members, and Section 47 Report—entered judgment denying Ms. Redmond's application to relocate JMR to the United States and granting Mr. Redmond guardianship and joint custody of JMR. More specifically, the Order directed Ms. Redmond, *inter alia*, "[n]ot to make any application to any court

outside the State in respect of [JMR]"; "[n]ot to remove [JMR] to a third country"; and "to live within a reasonable distance of Ballymurphy bearing in mind the Court's order that [JMR] should attend Ballymurphy National School." Petition for Return Ex. K. The court also directed the parties to "share access to [JMR] on a 50/50 basis." Id.

In response to the February 10 Order, Ms. Redmond requested leave of court to return to the United States for a short period in order to settle her affairs. The Irish court granted her request on the condition that she promise, among other things, to: (1) return to Ireland with JMR no later than March 30, 2011; (2) not to apply to another court for custody; (3) terminate her employment in Illinois; (4) move to County Carlow, Ireland, and live within a reasonable distance of Ballymurphy National School; (5) have JMR attend Ballymurphy National School; (6) share custody with Mr. Redmond on an every-other-day basis; and (7) purchase a plane ticket for JMR's return trip to Ireland within seven days of her return to the United States. Ms. Redmond concedes that she made each of these promises under oath, and that she never intended to keep any of them. Indeed, as set forth below, Ms. Redmond has failed to comply with all of the above sworn promises. Under oath, Ms. Redmond admitted this at the June 8, 2012 evidentiary hearing.

On February 15, 2011, Ms. Redmond returned with JMR to Illinois. On March 23, 2011, she retained Illinois counsel and filed a petition for award of sole custody in the Circuit Court of Cook County, Illinois. Ms. Redmond did not return with JMR to Ireland on March 30, 2011.

On May 10, 2011, the Irish court issued an Order requiring Ms. Redmond to produce JMR on June 30, 2011. The Irish court further declared that the retention of JMR in the United States after March 30, 2011 was wrongful within the meaning of Article 3 of the

Convention. When Ms. Redmond failed to personally appear on June 30, the Irish court issued an Order directing that Ms. Redmond be attached and brought before the court to answer for her failure to comply with the promises that she made in February 2011.

On July 27, 2011, the Circuit Court of Cook County denied Ms. Redmond's petition for custody, finding that the Irish courts had jurisdiction over the underlying custody issues. At the June 8, 2012 evidentiary hearing, Ms. Redmond testified to learning, that morning, of an outstanding warrant for her arrest in Ireland based on her failure to comply with the custody order.

### 3. JMR's Life[2]

JMR lived in Ireland from his birth through November 2007. During the course of the Irish custody proceedings—which have been ongoing for all but the first year of his life—JMR resided with Ms. Redmond in Illinois, returning to Ireland on numerous occasions for court proceedings. JMR has had a pediatrician and a dentist in Illinois. JMR was placed in childcare at KinderCare in Illinois from age two-and-a-half through three-and-a-half, for six hours a day, three days a week. In the scheme of things, childcare would be followed by toddler preschool in preparation for kindergarten and then the first grade of grammar school.

JMR has no physical, mental, or emotional problems and appears to be a happy and outgoing five-year-old boy.[3] Ms. Redmond testified that JMR has had play dates with friends in Illinois and that he has enjoyed playing sports. JMR was taken to St. Michael's church by Ms. Redmond or Ms. Redmond's parents. JMR has a large extended family in

---

[2] For purposes of these findings, the Court only considers facts relating to JMR prior to the date of wrongful retention which, as set forth below, the Court finds to be March 30, 2011.

[3] There is no indication that JMR's physical, mental, and emotional states were any different prior to March 30, 2011, when JMR had just turned four-years-old.

Illinois with whom he had frequent interaction, including grandparents, an aunt and uncle, and cousins.

Ms. Redmond told JMR about Ireland and that it is where his father and other grandparents live. According to Ms. Redmond, JMR has been in Ireland for a total of ten-and-a-half separated weeks between November 2007 and the entry of the custody Order on February 10, 2011. Ms. Redmond testified that JMR was in Ireland from late February 2008 until April 23, 2008, for one week in June 2008, one week in August 2008, one week in February 2009, ten days in June 2009, one week in December 2009, and one week before February 10, 2011.[4] On each occasion, JMR traveled to and from Ireland with Ms. Redmond. Prior to the February 10, 2011 custody Order, no court had ordered JMR to remain in Ireland.

**B. Conclusions of Law**

"The [ICARA] entitles a person whose child has wrongfully been removed to the United States in violation of the Convention to petition for return of the child to the child's country of 'habitual residence,' unless certain exceptions apply." Norinder v. Fuentes, 657 F.3d 526, 529 (7th Cir. 2011). Whether a child's removal or retention is "wrongful" must be decided under the laws of the country in which the child has his or her habitual residence. Avila, 538 F.3d at 583 (citation omitted).

Under the Convention, the initial burden is on Mr. Redmond to establish, by a preponderance of the evidence, that JMR was wrongfully removed to or retained in the

---

[4] During the evidentiary hearing, Ms. Redmond struggled to provide exact dates and claimed that she was unable to recall all of the times that she traveled with JMR back to Ireland; but, she provided the aforementioned dates in her proposed findings of fact. In addition, in a November 18, 2009 Order from the Irish court, Ms. Redmond was directed to bring JMR to Ireland for Christmas in 2010, although according to the dates provided by Ms. Redmond, JMR was not in Ireland during that time.

United States. See 42 U.S.C. § 11603(e)(1)(A). To establish wrongful retention, Mr. Redmond must show that: (1) JMR was a habitual resident of Ireland immediately prior to the date of retention; (2) the retention breached Mr. Redmond's custody rights under Irish law; and (3) Mr. Redmond was exercising those rights at the time of retention. See Convention arts. 3-4. If Mr. Redmond satisfies this burden, JMR must be returned to Ireland unless Ms. Redmond can establish one of the defenses set forth under 42 U.S.C. § 11603(e)(2).

## III. DISCUSSION

### A. Habitual Residence

"The first step for a court considering a petition is to determine the child's habitual residence." Norinder, 657 F.3d at 533. "The Convention does not define the term habitual residence," but rather regards it as a question of fact. Koch v. Koch, 450 F.3d 703, 712 (7th Cir. 2006). Indeed, "[t]he inquiry into a child's habitual residence is a fact-intensive determination that cannot be reduced to a predetermined formula and necessarily varies with the circumstances of each case." Karkkainen v. Kovalchuk, 445 F.3d 280, 291 (3d Cir. 2006) (citation omitted). "The determination of 'habitual residence' is to be based on the everyday meaning of these words rather than on the legal meaning that a particular jurisdiction attaches to them." Avila, 538 F.3d at 583.

### 1. Date of Retention

"The first step in determining a child's habitual residence is to discern when the alleged wrongful removal or retention took place, for 'the text of the Convention directs courts to only one point in time in determining habitual residence: the point in time 'immediately before the removal or retention.'" Barzilay v. Barzilay, 600 F.3d 912,

918 (8th Cir. 2010) (quoting Convention art. 3). The Court finds (and the parties agree) that the date of the alleged wrongful retention is March 30, 2011, the date upon which JMR's retention in Illinois first violated Irish law.[5] The Court therefore must decide whether JMR was a habitual resident of Ireland immediately prior to March 30, 2011. Accordingly, the Court does not consider the events in JMR's life after March 30, 2011.

### 2. JMR's Original Habitual Residence in Ireland

In determining habitual residence, the Court first examines the shared intent of the parents. Koch, 450 F.3d at 715; see also Gitter v. Gitter, 396 F.3d 124, 133 (2d. Cir. 2005) ("In nearly all of the cases that arise under the Convention . . . the parents have come to disagree as to the place of the child's habitual residence. It then becomes the court's task to determine the intentions of the parents as of the last time that their intentions were shared."). This examination is especially relevant in cases involving young children such as JMR. See Koch, 450 F.3d at 713 ("In the case of young children, the court found it most prudent to focus on the intent of the parents rather than the intent of the child in determining the child's habitual residence."). "Often parents will not agree about what their shared intentions were once litigation is underway, and so we must take account of the parents' actions as well as what they say." Norinder, 657 F.3d at 534.

Mr. and Ms. Redmond, unmarried, had an intimate relationship for over ten years and maintained a home in Ireland. Ms. Redmond was born in the United States, but at the time of her pregnancy with JMR, had lived in Ireland for a decade. While JMR was

---

[5] Mr. Redmond was granted joint custody and guardianship of JMR on February 10, 2011, and based on that Order, Ms. Redmond was to return JMR to Ireland on March 30, 2011, which she failed to do. Since that date, Ms. Redmond has held JMR in the United States in contravention of Irish law.

also born in the United States,[6] Mr. and Ms. Redmond immediately returned with him to Ireland when he was only eleven-days-old. The parties lived together with JMR in Ireland until November 2007. The quick return with JMR to their home in Ireland after his birth evidences the parents' shared intent that JMR reside in Ireland. Therefore, at least initially, JMR's habitual residence was in Ireland. See Uzoh v. Uzoh, No. 11 C 09124, 2012 WL 1565345, at *4 (N.D. Ill. May 2, 2012) ("The son was born in the United States. . . . Nonetheless, at the time of the son's birth, the established family home was in Bristol, England. The father consented to the son's birth in the United States with the joint understanding that his wife would return to England with their children within several months. He purchased round trip airline tickets. The parents' joint intent for the son to live with the family in England has been established by a preponderance of the evidence.").

### 3. JMR's Habitual Residence has not Changed

Since November 2007, the parties have not maintained a shared intent as to the location of JMR's habitual residence. The question before the Court, therefore, is whether JMR's habitual residence has changed from Ireland to Illinois.

There are no bright line rules as to when habitual residence changes. Rather, a flexible application of the law to the unique facts of every case has created a continuum. On one end are cases where "the court finds that the family as a unit has manifested a settled purpose to change habitual residence, despite the fact that one parent may have had qualms about the move." Mozes v. Mozes, 239 F.3d 1067, 1076 (9th Cir. 2001). On the other end "are cases where the child's initial translocation from an established

---

[6] The Court notes that "[b]irth in the United States does not automatically render [a child's] habitual residence as the United States." Uzoh v. Uzoh, No. 11 C 09124, 2012 WL 1565345, at *5 (N.D. Ill. May 2, 2012) (citing Kijowska v. Haines, 463 F.3d 583, 587 (7th Cir. 2006)).

habitual residence was clearly intended to be of a specific, delimited period." Id. at 1077. "In these cases, courts have generally refused to find that the changed intentions of one parent led to an alteration in the child's habitual residence." Id. The present dispute falls much closer to the latter end.

### a. JMR's Life in Illinois has Always Been Contingent on Litigation in Ireland

In determining whether JMR's habitual residence has changed, the Court first asks "whether a merely transitory, contingent, or other temporary purpose is apparent." Mozes, 239 F.3d at 1075 n.18 (quoting Carol S. Bruch, Temporary or Contingent Changes in Location Under the Hague Child Abduction Convention, Gedächtnisschrift Alexander Lüderitz 43, 51 (H.Schack, ed. 2000). Where the "parents no longer agree on where the children's habitual residence has been fixed, [the Court] must look beyond the representations of the parties and consider all available evidence." Holder v. Holder, 392 F.3d 1009, 1017 (9th Cir. 2004) (quotation omitted).

Ms. Redmond's actions reveal that she was fully aware, her hopes and desires notwithstanding, that JMR's status in Illinois has always been contingent on the Irish custody proceedings. Both Mr. and Ms. Redmond vigorously litigated their cases before the Irish courts. Ms. Redmond was represented throughout the Irish custody proceedings and fully participated in them, frequently traveling with JMR to Ireland for court dates. Ms. Redmond was well aware that Mr. Redmond was seeking guardianship and custody rights of JMR *in Ireland*. Indeed, in January 2009, Ms. Redmond filed her own application in the Irish courts for an Order allowing JMR to relocate with her to the United States. Although she may have hoped to move permanently to Illinois, Ms. Redmond also recognized that Ireland would have the ultimate say. For his part, Mr.

Redmond has never waivered that Ireland is JMR's habitual residence, as he filed for custody and guardianship shortly after Ms. Redmond first left.

These circumstances weigh against a finding that JMR's habitual residence changed from Ireland to Illinois. It is extremely unfortunate that this custody battle has lasted for what is now over four years. That it has, however, does not change the fact that JMR's status in Illinois—as evidenced by the conduct of both parties—has always been "contingent" or "temporary," and has never been "settled." Mozes, 239 F.3d at 1075 n.18; see also Whiting v. Krassner, 391 F.3d 540, 549 (3rd Cir. 2004) ("[W]here the child's initial move from an established habitual residence was clearly intended to be for a specific, limited duration . . . most courts will find no change in habitual residence."). Ms. Redmond acknowledged so much when she met with the Irish community welfare officer on March 12, 2008, when she petitioned the Irish courts to allow JMR to relocate with her to the United States in January 2009, and when she promised the Irish court in February 2011 that she would return with JMR to Ireland by March 30, 2011.

### b. JMR's Level of Acclimatization and Ms. Redmond's Unilateral Actions

The next question is whether acclimatization should suffice to establish a change in JMR's habitual residence. Courts will often consider a child's habitual residence to be "the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective." Feder v. Evans-Feder, 63 F.3d 217, 224 (3d. Cir. 1995). Under this framework, if JMR has become "acclimatized to the new environment to such a degree," then he can become "a habitual resident of the new country despite the parents' shared intentions." Koch, 450 F.3d at 714.

Ms. Redmond contends that JMR's life in Illinois from November 2007 through March 30, 2011, has changed his habitual residence from Ireland to Illinois. Ms. Redmond testified that JMR has had a pediatrician and dentist in Illinois and that she placed him in KinderCare from the age of two-and-a-half through three-and-a-half. She further testified that JMR goes with her (or her parents) to St. Michael's church, has play dates with his friends, and frequently interacts with his large extended family in Illinois, which includes Ms. Redmond's parents, an aunt and uncle, and many cousins. Ms. Redmond notes that JMR has spent approximately ten-and-a-half weeks in Ireland between November 2007 and February 2011, but that these returns were (with the exception of the first) all for court dates.

While these facts, coupled with the passage of nearly three-and-a-half years of very early childhood, suggest that JMR is happy and well-adjusted to his life in Illinois, such a finding is not dispositive of habitual residence in this case. The Ninth Circuit has cautioned that "[d]espite the superficial appeal of focusing primarily on the child's contacts in the new country . . . we conclude that, in the absence of settled parental intent, courts should be slow to infer from such contacts that an earlier habitual residence has been abandoned." Mozes, 239 F.3d at 1079; see also Gitter, 396 F.3d at 134 ("Permitting evidence of acclimatization to trump evidence of earlier parental agreement could 'open children to harmful manipulation when one parent seeks to foster residential attachments during what was intended to be a temporary visit.'" (quoting Mozes, 239 F3d. at 1079)).[7] This approach first recognizes that the Convention "is designed to prevent child abduction by reducing the incentive of the would-be abductor to seek unilateral custody

---

[7] The Seventh Circuit has "adopted a version of the analysis set out by the Ninth Circuit in [Mozes]." Norrinder, 657 F.3d at 534.

over a child in another country. The greater the ease with which habitual residence may be shifted without the consent of both parents, the greater the incentive to try." Mozes, 239 F.3d at 1079; see also Karpenko v. Leendertz, 619 F.3d 259, 265 (3d. Cir. 2010). ("The purpose of the Convention is to safeguard the child by discouraging kidnapping in connection with custody disputes."). Second, and perhaps more critically, it recognizes that "[t]he length of the child's residence in the country of one of the parent's cannot be decisive," Kijowska, 463 F.3d at 587, as that would create the opportunity for one parent to unilaterally attempt to change the habitual residence of a child by taking advantage of a protracted custody dispute. Under this framework, "[t]he function of a court applying the Convention is not to determine whether a child is happy where it currently is, but whether one parent is seeking unilaterally to alter the status quo with regard to the primary locus of the child's life." Mozes, 239 F3d. at 1079.

Ms. Redmond unilaterally removed JMR from his original habitual residence in Ireland.[8] Shortly thereafter, Mr. Redmond initiated custody proceedings to get JMR back. Indeed, what makes this case unique is Mr. Redmond's vigorous (and thus far successful) pursuit of his custody rights for nearly the entire duration of JMR's life in Illinois. As properly recognized by the Irish courts as well as the Circuit Court of Cook County, this is an Irish custody dispute, the merits of which have been, and should continue to be, adjudicated in Ireland. Ms. Redmond's flight to Illinois—which was only permitted in the first place because she promised under oath to return to Ireland—is precisely the conduct that the Convention is designed to prevent.

---

[8] In order to determine whether one parent had acted unilaterally, the Court considers what the parents once jointly intended. Karkkainen, 445 F.3d at 296. As set forth above, JMR's habitual residence as of November 2007 was Ireland. As evidenced by Mr. Redmond's filing of the custody application, Ms. Redmond acted unilaterally when she left Ireland with JMR.

Finally, the Court notes that this result is consistent with the Supreme Court's decision in <u>Abbott</u>, which explains that the Convention "should not be interpreted to permit a parent to select which country will adjudicate [custody] questions by bringing the child to a different country, in violation of a *ne exeat* right. Denying a return remedy for the violation of such rights would legitimize the very action—removal of the child—that the home country, through its custody order . . . sought to prevent and would allow parents to undermine the very purpose of the Convention." <u>Abbott</u>, 130 S.Ct. at 1996 (internal quotations omitted). The Court heeds <u>Abbott's</u> admonition that it be "most reluctant to adopt an interpretation [of the Convention] that gives an abducting parent an advantage by coming here to avoid a return remedy that is granted [here, by Ireland]." <u>Id.</u> Indeed, requiring a return remedy in cases like this "helps deter child abductions and respects the Convention's purpose to prevent harms resulting from abductions . . . [such as] prevent[ing] the child from forming a relationship with the left-behind parent, impairing the child's ability to mature." <u>Id.</u>

Accordingly, for the reasons set forth above, the Court finds that JMR's habitual residence was and still is in Ireland.

**B. Breach of Custody Rights**

Next, the Court must consider whether Mr. Redmond has "rights of custody" over JMR under Irish law and whether JMR's retention in Illinois breached those rights. <u>See</u> Convention art. 3(a). The Convention states that rights of custody "may arise . . . by reason of a judicial or administrative decision." <u>Id.</u> art. 3.

Mr. Redmond has satisfied this burden. As set forth above, the Irish courts granted Mr. Redmond joint custody rights on February 10, 2011. While Ms. Redmond was

granted leave to settle her affairs in the United States, she was ordered to return to Ireland with JMR by March 30, 2011, in order to share custody of JMR with Mr. Redmond "on a 50/50 basis." While ostensibly settling her affairs, she filed suit in the Circuit Court of Cook County. Ms. Redmond never returned to Ireland with JMR, and thereby breached Mr. Redmond's custody rights under Irish law.

## C. Exercise of Custody Rights

To satisfy the final element of the prima facie case of wrongful removal, Mr. Redmond must prove by a preponderance of the evidence that, "at the time of the removal or retention [his] rights [of custody] were actually exercised . . . or would have been so exercised but for the removal or retention." Convention art. 3(b). "Although the Convention does not define 'exercise of custody rights,' case law indicates that 'a petitioner's burden under Article 3(b) is minimal.'" Habrzyk v. Habrzyk, 759 F. Supp. 2d 1014, 1022 (N.D. Ill. 2011) (quoting Asvesta v. Petroutsas, 580 F.3d 1000, 1018 (9th Cir. 2009)). "Once a petitioner has established that he or she has custody rights under the laws of the country of habitual residence, courts 'liberally' find the exercise of those custody rights." Id.

Mr. Redmond has exercised or attempted to exercise his custody rights since March 25, 2008, the date he initiated the Irish custody case. Mr. Redmond has continued to actively pursue those rights through the instant petition under the Convention. Through his past and continued legal efforts, Mr. Redmond has established that he would have exercised his custody rights but for JMR's retention in Illinois. See Uzoh, 2012 WL 1565345, at *5 ("The father repeatedly sought the return of his children and vigorously continues to do so through legal processes. The mother has frustrated the father's efforts

to exercise his joint right to custody of his children. A preponderance of the evidence establishes that the father has taken every reasonable (and a few unreasonable) means to exercise his joint custody rights.").

Mr. Redmond has therefore established, by a preponderance of the evidence, that as of March 30, 2011, JMR was wrongfully retained in Illinois, in violation of the Convention. See, e.g., Flynn v. Borders, 472 F. Supp. 2d 906, 911 (E.D. Ky. 2007) ("Pursuant to the High Court Order, [petitioner] had valid custody rights under the law of Ireland and would have been exercising such rights but for [respondent's] retention of [the child] in August of 2006. [Respondent] has not returned [the child] to Ireland pursuant to that order; therefore, [petitioner] has met her burden of showing wrongful retention and the burden now shifts to [respondent].").

## D. Affirmative Defenses

There are four affirmative defenses available under the ICARA. See 42 U.S.C. § 11603(e)(2). Ms. Redmond first raises the "settled defense" based on Article 12 of the Convention. Under this defense, Ms. Redmond must establish by a preponderance of the evidence that "proceedings have been commenced after the expiration of the period of one year" from the date of the wrongful removal or retention and "that the child is now well settled in its new environment." Convention art. 12; 42 U.S.C. § 11603(e)(2)(B). Ms. Redmond has failed to establish that more than a year has passed between the wrongful retention of JMR and Mr. Redmond's filing of the petition. Mr. Redmond filed the instant petition on December 1, 2011. The wrongful retention occurred on March 30, 2011. Regardless of the degree to which JMR has become settled in his new

environment, Mr. Redmond filed his petition within one year of the wrongful retention. Accordingly, the "well settled" defense is unavailable to Ms. Redmond.

Ms. Redmond also asserts an affirmative defense under Article 17 of the Convention. Under Article 17, the person who wrongfully removes or retains a child cannot insulate the child from the Convention's return provisions merely by obtaining a custody order in the country of new residence. This provision is intended to ensure, *inter alia,* that the Convention takes precedence over decrees made in favor of abductors before the court has notice of the wrongful removal or retention. While the Court, as it must, has followed Article 17 in this decision, Article 17 is not an affirmative defense under the Convention. In any event, Article 17 does not help Ms. Redmond because the Circuit Court of Cook County found that Ireland had jurisdiction over the underlying custody issues. To the extent Ms. Redmond seeks to use Article 17 to argue that the Irish custody order violates her constitutional rights as an American citizen, that argument is rejected. As set forth above, this is an Irish custody dispute and Ms. Redmond's remedies, if any, must be pursued in Ireland. Ms. Redmond's Article 17 defense is without merit.

## IV. CONCLUSION

For the foregoing reasons, Mr. Redmond's petition for the return of JMR to Ireland is granted. JMR shall be promptly returned to Ireland, accompanied by Ms. Redmond, on or before July 9, 2012. Ms. Redmond's counsel shall coordinate all aspects of JMR's return to Ireland with Mr. Redmond's counsel. Neither party shall remove JMR from the Northern District of Illinois until he is returned to Ireland. If either party removes the child in violation of this Order, the Court shall issue a warrant for the arrest of the removing party and appearance for a contempt hearing. Consistent with Article 19 of the Convention, this Order is not a determination of the merits of any custody issue. The parties are left to proceed in Ireland to resolve JMR's ongoing parenting needs.

IT IS SO ORDERED.

ENTER:

CHARLES RONALD NORGLE, Judge
United States District Court

DATED: June 19, 2012